**Lavelle M. COOK and Kenneth S. Matheis, Appellants,**

v.

**Patsy Jane COOK, Appellee.**

**No. 89–SC–799–DG.**

Supreme Court of Kentucky.

Nov. 29, 1990.

Kenneth S. Matheis, Donna L. Matheis, Louisville, for appellants.

Eugene L. Mosley, Mary D. Schoening, Kathleen Voor Montano, Miller, Mosley, Clare & Townes, Louisville, for appellee.

VANCE, Justice.

The question is whether the conduct of the appellee and her boyfriend amounted to "cohabitation" as that term is used in a property settlement agreement which was incorporated in the decree of dissolution of the marriage of the appellant and the appellee.

Paragraph 5 of the agreement provides as follows:

"The Petitioner shall pay to the Respondent the sum of FIVE HUNDRED DOLLARS ($500.00) per month as maintenance for her support. The first of said payments shall be due and payable on March 1, 1986, and continue on the first day of each and every month thereafter until the Respondent dies, remarries, begins cohabitation with a non-relative adult male, or December 31, 1990, whichever event shall first occur. Upon the Respondent's death, remarriage, cohabitation with a non-relative adult male, or on December 31, 1990, whichever event shall first occur, the Petitioner's obligation to pay maintenance to the Respondent shall cease and forever terminate."

Appellant seeks to terminate the payment of maintenance to the appellee upon the ground that the appellee has cohabited with a nonrelative adult male. The facts are not in dispute. The appellee has established a relationship with a gentleman friend. Although they have engaged in an exclusive sexual relationship, they maintain separate households and reside in separate residences. Each of them pays his own household and living expenses.

The appellee's friend visits her on a daily basis. Frequently they dine out in the evenings, and he pays for the meals on those occasions. He has purchased a motor vehicle in their joint names because he says that in the event of his death he wishes her to have the vehicle. She has her own bank account and he has opened a

bank account on which she is permitted to sign checks. She tends to the payment of his bills from this account and claims that she has never used any of his money for her personal expense. She sometimes borrows money from him but always repays it.

He has asked her to marry him, and she has refused because, among other reasons, she does not want to forego the maintenance payments she receives until they terminate automatically on December 31, 1990.

■ Cohabitation is defined in *Black's Law Dictionary*, 5th Edition, as follows:

"To live together as husband and wife. The mutual assumption of those marital rights, duties, and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations."

We think the evidence in this case and the facts as found by the commissioner and adopted by the trial court do not establish that the appellee and her friend were living together as husband and wife or that they have mutually assumed the duties and obligations normally assumed by married persons.

They do not live in the same household, and neither of them has assumed an obligation to pay the household bills or personal expenses of the other. They have not moved household furnishings from one house to the other. Although he visits in her home on most evenings, he returns to his own home to spend the night, and they do not engage in sexual relations when her son, who lives with her, is present in the home.

*Combs v. Combs*, Ky., 787 S.W.2d 260, (1990), has no applicability to this case because the issue in *Combs* was whether there had been a change in circumstances sufficient to modify maintenance pursuant to K.R.S. 403.250(1). Here the issue is not whether a change of circumstances has occurred but whether there has been "cohabitation" which would automatically terminate maintenance under the terms of the contract.

Whether or not conduct amounted to cohabitation was not an issue in *Combs v. Combs, supra,* and for that reason that opinion is not of any relevance concerning whether the conduct in this case constitutes cohabitation. The word "cohabitation" as used in *Combs, supra,* was synonymous with "change of circumstances."

■ In addition to the fact that the conduct described herein does not fit within the classic dictionary definition of cohabitation, it also does not comport with the conduct that the appellant and the appellee intended by the word cohabitation as used in their contract. The intention of the parties must be gleaned from the words used by them in the agreement. We note by the terms of their agreement that only cohabitation with a *nonrelative* adult male would terminate maintenance. Cohabitation with a relative adult male would not terminate maintenance. This leads to the conclusion that the parties were not thinking of cohabitation in terms of sexual relationships because surely the agreement was not meant to condone sexual relations with an adult kinsman. Obviously, the parties intended cohabitation to mean "living in the same house," and thus living in the same house with an adult male relative would be permitted, whereas living in the same house with an adult male nonrelative would constitute cohabitation and would terminate maintenance.

Under the facts of this case, we conclude that the Court of Appeals was correct in its decision that the appellee did not cohabit with a nonrelative adult male.

The decision of the Court of Appeals is affirmed.

STEPHENS, C.J., and GANT, LEIBSON, VANCE and WINTERSHEIMER, JJ., concur.

LAMBERT, J., dissents by separate opinion in which COMBS, J., joins.

LAMBERT, Justice, dissenting.

Characterizing this as a case in which "the facts are not in dispute," the majority has nevertheless failed to adequately describe the relationship between appellee

and the man with whom she cohabits. The trial judge who rendered an exhaustive opinion and order and determined from the evidence that cohabitation was proven stated the facts with considerably more particularity than the majority has seen fit to provide and in the interest of fairness, the facts as found by the trial court are stated as follows:

"Specifically, and somewhat condensed, what has occurred in this case since sometime late in 1986, is that Mr. Spradling and the respondent have been daily companions. While the evidence discloses there have been a few occasions on which they have not seen each other every day, the overwhelming evidence is that they spend some part of each day together. They eat together frequently as much as four or five nights a week, and Mr. Spradling pays for the respondent's meals on these occasions. They attend church together. Mr. Spradling stops by respondent's house every day to check on the house and on her son. Mr. Spradling has provided a T.V. set and a VCR for the respondent, which are at her home. The respondent washes Mr. Spradling's clothing on a regular basis.

"Mr. Spradling has given the respondent an engagement ring, and although the petitioner [sic] stated at the oral argument on exceptions that the engagement was off, she testified under oath, at an earlier time, that the reason she did not accept Mr. Spradling's proposal of marriage was 'that she would not marry Mr. Spradling until she got all she could from the petitioner.' While she did attempt to modify that statement by stating that she did not plan to marry until her son was grown, her intent was clear from the statement she made under oath.

"The respondent and Mr. Spradling are the joint owners of a van purchased entirely by Mr. Spradling. This van is used regularly by the respondent, and Mr. Spradling pays for gas when they use the van on social occasions, and its upkeep. The respondent has used Mr. Spradling's credit cards on occasion and borrowed money from him. Although there is evidence that some of that money has repaid, and the respondent testified that it has all been repaid, the fact that she has the use of Mr. Spradling's credit cards is a factor that weighs toward cohabitation.

"Additionally, Mr. Spradling and the respondent share a joint checking account, and while it is true that predated their sexual intimacy and was done initially for the purpose of enabling the respondent to assist Mr. Spradling in the handling of his financial affairs, it nevertheless is true that they currently share and have for sometime this joint account.

"In addition, since sometime in 1986, the respondent and Mr. Spradling have engaged in sexual relations with each other to the exclusion of all other persons.

"In short, it is the court's opinion that every vestige of cohabitation exists in this case with the single exception that the respondent and Mr. Spradling maintain separate houses. The evidence is that they engage in sexual relations only at Mr. Spradling's house, although a good deal of their time is spent at the respondent's home." (Trial court opinion and order, p. 9–11).

In an effort to avoid reaching the result compelled by the foregoing facts, the majority has taken a hypertechnical approach and essentially held that despite any other facts, the failure of the persons to share a common dwelling house on a regular basis precludes a finding of cohabitation. In my view, such an interpretation is contrary to these parties' agreement that maintenance was to be terminated upon the cohabitation of the recipient spouse. By its decision, the majority has encouraged spouses receiving maintenance to refrain from marriage, safe in the knowledge that they may establish relationships which have all of the incidents of marriage if only they maintain the fiction of separate places of dwelling.

In a mobile and frequently affluent society, the concept of cohabitation is often ambiguous. Parties whose relationships have all of the trappings of marriage and even married persons frequently live apart. The fact that persons may not live in the same

dwelling on a daily basis should not be the controlling factor. The nature of the parties' relationship should be broadly analyzed and a decision rendered upon the totality of same.

The decision of the majority will surely encourage fraud and evasion of parties' consensual undertakings and weaken this Court's decision in *Combs v. Combs*, Ky., 787 S.W.2d 260 (1990). In *Combs*, the Court identified six factors which should be considered in determining whether parties' subsequent relationships are of such significance as to justify relief from the duty to pay maintenance. In my view, the decision in *Combs* represents a balanced, progressive approach to deciding whether relief from maintenance is justified. Such a decision was desperately needed in view of the frequency with which unmarried persons nowadays establish quasimarital relationships.

It should not be overlooked that the concept of cohabitation embraces far more than simply sharing the same dwelling. A party seeking to avoid the implication of cohabitation will always be able to point to some factor about his or her circumstances which is unconventional and by the terms of the decision of the majority, such would be sufficient to defeat a finding of cohabitation.

When all is said and done, the majority opinion amounts to a victory for deceit, bad faith, and the distasteful practice of requiring a maintenance payor to subsidize the illicit relationship of the maintenance recipient. That appellant intended to evade the terms of her agreement is attested by her statement "that she would not marry Mr. Spradling [the man with whom she cohabits] until she got all she could from the petitioner [appellant herein]." This Court should not reward such conduct and permit appellant to be victimized in such a manner.

COMBS, J., joins in this dissenting opinion.