Diane T. BENNETT, Appellant,

v.

Donald W. BENNETT, O.D., M.D., Appellee.

No. 2003–CA–000186–MR.

Court of Appeals of Kentucky.

Feb. 13, 2004.

Case Ordered Published by Court of Appeals April 9, 2004.

Vicki L. Buba, Stone, Pregliasco, Haynes, Buba, LLP, Louisville, KY, for Appellant.

Diana L. Skaggs, Melinda A. Whitton, Diana L. Skaggs & Associates, Louisville, KY, for Appellee.

Before TACKETT and VANMETER, Judges; and MILLER, Senior Judge.[1]

## OPINION

TACKETT, Judge.

Diane Bennett appeals from an order of the Jefferson Family Court granting summary judgment in favor of her former spouse, Donald Bennett, on Donald's motion to terminate maintenance payments to Diane due to her cohabitation with Charles Friedman. The parties had entered into a settlement agreement providing that Donald's obligation to pay maintenance would terminate upon the death of either party, Diane's remarriage, or her cohabitation. The trial court found that Diane and Friedman began cohabitating in July 2001 and terminated Donald's maintenance obligation as of that date. After a careful review, we affirm.

Diane and Donald executed a marital settlement agreement on August 23, 2000, and it was incorporated by reference into the decree dissolving their marriage which the trial court entered on October 23, 2000. Pursuant to that agreement, Diane received a six-figure settlement from Donald and additionally Donald was to pay maintenance to Diane until this obligation should be extinguished by one of the following: the death of either party, Diane's remarriage, or Diane's cohabitation with someone. No further definition of the term "cohabitation" was contained in the settlement agreement, and both parties were represented by counsel.

Donald paid maintenance to Diane in accordance with the settlement agreement until he learned of her relationship with Friedman which began sometime in 2001. On July 29, 2002, Donald filed a motion to terminate his maintenance obligation alleging that Diane was cohabitating with Friedman. Deposition testimony was taken from Diane regarding the details of her living arrangements with Friedman. Her testimony established that, since July 2001, Friedman had slept with Diane in her home every night unless he was out of town on business. Both parties moved for summary judgment and, on January 3,

---

1. Senior Judge John D. Miller sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

2003, the trial court granted Donald's motion for summary judgment and terminated his maintenance obligation. This appeal followed.

In order to grant summary judgment, a trial court must determine that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Steelvest, Inc. v. Scansteel Service Center,* Ky., 807 S.W.2d 476 (1991). The trial court had before it a wealth of undisputed facts with reference to the relationship between Diane and Friedman. In May 2001, Diane gave Friedman a ring for his birthday that may have cost as much as $1,000.00. In July 2001, Friedman began spending every night with Diane and kept his clothes at her house and their deposition testimony indicated that this was an exclusive, monogamous sexual relationship between the two of them since that time. Friedman also paid her housekeeper, who came three days a week, the sum of $720.00 a month for washing his clothes. Diane gave Friedman gifts every night during Hanukkah 2001, including a $500.00 watch. Friedman, a lawyer, twice provided legal services to Diane free of charge in matters relating to Donald's efforts to terminate maintenance even though he was not the attorney of record in this case. The couple took trips and vacations together as well, including a trip to Quebec which Diane paid for as a birthday gift to Friedman. According to the evidence, they slept in the same bed even when they visited relatives and friends. Friedman regularly used Diane's vehicles and had a charge card on her American Express account. The facts in this case are not at issue, but rather the interpretation of these facts.

Diane first argues that the facts before the trial court did not support a finding that she cohabitates with Friedman. She points out that Friedman is not yet divorced from his wife, that he maintains his own banking accounts, investments, and credit cards, and that his driver's license lists as his residence the location where his furniture is located. Consequently, she contends that the trial court's finding is based on the existence of a sexual relationship between the parties and disputes the sufficiency of such evidence to support a finding of cohabitation. Further, Diane maintains that we should adopt the definition, found in *Black's Law Dictionary 6th Ed.* (1991), of "cohabitation" as, "To live together as husband and wife. The mutual assumption of those marital rights, duties, and obligations which are usually manifested by married people, including but necessarily dependant on sexual relations." In support of her argument, she cites the Kentucky Supreme Court's decisions in *Combs v. Combs,* Ky., 787 S.W.2d 260 (1990) and *Cook v. Cook,* Ky., 798 S.W.2d 955 (1990).

In *Combs,* the former husband was under court order to pay maintenance and its duration was not limited by any agreement between the parties. Previously, the trial court had reduced Combs' maintenance obligation to his former wife from $1,000.00 per month to $800.00 per month and eventually to $500.00 per month. Combs filed a motion to terminate his maintenance obligation based on his former wife's cohabitation with someone else. However, since cohabitation is not grounds under the statute to terminate maintenance, the trial court was forced to determine whether the former wife's cohabitation provided her with a financial resource, as contemplated in Kentucky Revised Statute 403.200(2)(a), which would render Combs' continued maintenance obligation unconscionable. Despite the fact that the payment of maintenance in *Combs* was not governed by an agreement between the parties, Diane argues we are bound to consider the *Combs* Court's listed factors which indicate cohab-

itation. The Kentucky Supreme Court determined in the *Cook* case, however, that *Combs* "is not of any relevance" in deciding whether or not conduct between a former spouse and her paramour amounts to cohabitation. *Cook* at 957.

The *Cook* case involved a separation agreement between the parties which included language terminating maintenance in the event the former wife cohabitated "with a non-relative adult male." Although the former wife was engaged in an exclusive sexual relationship, had accepted an engagement ring, and shared some financial resources with her paramour, the Court declined to find cohabitation. Diane argues that, since her relationship with Friedman does not provide her with a financial benefit and their finances are not similarly intertwined, the trial court erroneously found that she and Friedman were cohabitating. We disagree and quote from the following portion of the *Cook* Court's reasoning:

> They do not live in the same household, and neither of them has assumed an obligation to pay the household bills or personal expenses of the other. They have not moved household furnishings from one household to the other. Although he visits in her home on most evenings, he returns to his own home to spend the night, and they do not engage in sexual relations when her son, who lives with her, is present in the home.
>
> . . .
>
> In addition to the fact that the conduct described above does not fit within the classic dictionary definition of cohabitation, it does not comport with the conduct that the appellant and the appellee intended by the word cohabitation as used in their contract. The intention of the parties must be gleaned from the words used by them in the agreement. We note by the terms of their agreement that only cohabitation with a *non-*

*relative* adult male would terminate maintenance. Cohabitation with a relative adult male would not terminate maintenance. This leads to the conclusion that the parties were not thinking of cohabitation in terms of sexual relationships because surely the agreement was not meant to condone sexual relations with an adult kinsman. Obviously, the parties intended cohabitation to mean "living in the same house," and thus living in the same house with an adult male relative would be permitted, whereas living in the same house with an adult male nonrelative would constitute cohabitation and would terminate maintenance.

*Cook* at 957. Diane and Donald did not include any definition of cohabitation in their separation agreement; however, her relationship with Friedman qualifies as cohabitation whether considered in light of sexual involvement or living in the same house. The evidence introduced from Diane and Friedman plainly indicated that he had spent every night with her in her house since July 2001 unless he happened to be out of town on business and unaccompanied by Diane.

Diane next argues in the event that we determine that the trial court did not err in finding that she is cohabitating with Friedman, that the date of July 2001 is not supported by the evidence. Although it is true that evidence of the ongoing nature of this relationship was produced before the trial court, in its January 2003 order granting Donald's summary judgment motion, the trial court simply states that cohabitation began in July 2001. Donald points out that generally a trial court's construction of a contract's terms is controlled by the parties' intentions at the time the contract was executed. *Gibson v. Sellars*, Ky., 252 S.W.2d 911 (1952). He argues that, when their separation agreement was negotiated, neither he nor Diane

knew of the esoteric definition of cohabitation found in *Black's Law Dictionary*. Looking at the four corners of the document, there is no indication that the parties intended to invest the term "cohabitation" with any special meaning beyond the ordinary meaning of the word itself. A review of the Webster's, Cambridge, American Heritage, and Princeton University dictionaries discloses that only one of them defines cohabitation in terms of living as husband and wife while the other three explicitly apply the term to a couple living together and not married to one another. Since it is undisputed that, as of July 2001, Friedman began spending every night with Diane in her home and keeping his clothes and personal items there, we decline to find that the trial court erred in fixing the date upon which their cohabitation began.

For the foregoing reasons, the judgment of the Jefferson Family Court is affirmed.

ALL CONCUR.