RENDERED: DECEMBER 9, 2022; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0001-MR

YVONNE M. CENTA (FORMERLY
LINDSEY)                                                          APPELLANT


                    APPEAL FROM OLDHAM FAMILY COURT
v.                  HONORABLE DOREEN S. GOODWIN, JUDGE
                    ACTION NO. 14-CI-00123


WILLIAM E. LINDSEY                                                  APPELLEE


                              OPINION
                        VACATING AND REMANDING

                         ** ** ** ** **

BEFORE: TAYLOR, K. THOMPSON, AND L. THOMPSON, JUDGES.

THOMPSON, K., JUDGE: Yvonne M. Centa (formerly Lindsey) appeals from the

Oldham Family Court's order terminating the maintenance obligations due Yvonne

from her former husband William Lindsey. The dissolution decree specified that

maintenance would automatically terminate upon Yvonne's cohabitation. At issue

is whether the family court erred by: (1) finding that Yvonne was cohabiting with

Craig Cook; (2) summarily terminating William's maintenance obligation upon a

finding of cohabitation (rather than the family court having to determine whether continued maintenance was unconscionable pursuant to Kentucky Revised Statutes (KRS) 403.250); and (3) retroactively terminating William's maintenance obligation effective to the filing of the motion requesting termination, thus requiring that Yvonne reimburse William. We vacate because the family court incorrectly interpreted the relevant law by: (1) failing to apply an appropriate definition of cohabitation and make appropriate findings pursuant to it; (2) concluding that the automatic termination clause in the dissolution decree was enforceable in the same way as such a clause would be, were it part of a separation agreement; and (3) failing to consider the controlling provisions of KRS 403.250(1) as interpreted by *Combs v. Combs*, 787 S.W.2d 260 (Ky. 1990), to determine if such cohabitation resulted in continued maintenance being unconscionable. Therefore, on remand, the family court must apply a proper definition and make appropriate findings before determining if Yvonne is cohabiting, if so whether continuing maintenance is unconscionable, and if so whether the termination of maintenance should be retroactive to the filing of the motion to terminate.

Yvonne and William were married in 1986 and their divorce was finalized in 2016. The family court was required to resolve disputed matters and ultimately in the dissolution decree ordered William to pay Yvonne maintenance in

the amount of $5,900 per month for ten years. A clause in the decree stated that maintenance "shall terminate upon the death of either party, or upon [Yvonne's] remarriage or cohabitation with [a] romantic partner[.]" The term "cohabitation" was not defined or otherwise further explained within the court's decree. Neither party filed a direct appeal.

In January 2020, William requested that the family court terminate his maintenance obligation, alleging that Yvonne was cohabiting with Craig. Yvonne opposed the motion and denied she was cohabiting. Unfortunately, the hearing on William's motion was not conducted until January 2021, due at least in part to closures and delays associated with the COVID-19 pandemic.

At the January 2021 hearing, which was conducted via videoconference, Yvonne, Craig, and a private investigator hired by William each testified. Yvonne and Craig admitted having been in a sexually intimate relationship but asserted their relationship had ended and they had not cohabited. They admitted having taken trips together but insisted they paid their own expenses. They adamantly denied that Craig made financial contributions to Yvonne. By contrast, the investigator testified that her observation of Yvonne's home showed that Craig frequently left in the early morning hours and often drove Yvonne's vehicles.

The family court's order granting William's motion to terminate maintenance was not filed until early June 2021. The family court concluded, despite Yvonne's and Craig's denials, that Yvonne had been cohabiting with Craig as her romantic partner. The family court then proceeded to terminate William's maintenance obligation without any additional analysis, concluding this was warranted due to the clause in the dissolution decree providing for automatic termination upon cohabitation. The family court made the termination of maintenance retroactive to the date William's motion was filed. This had the practical result of Yvonne owing William over $100,000 to reimburse him for the maintenance she received during the pendency of his motion.

Yvonne filed a motion to alter, amend, or vacate under Kentucky Rules of Civil Procedure (CR) 59.05. Among Yvonne's arguments was that the family court erred by not conducting an appropriate analysis under KRS 403.250 as to whether the cohabitation made it unconscionable for her to continue to receive maintenance. Yvonne also argued that the family court erred by terminating maintenance retroactively.

The family court denied Yvonne's motion in December 2021, relying upon the automatic termination clause in the decree. The family court also held

that retroactive termination was permissible under *Mudd v. Mudd*, 903 S.W.2d 533 (Ky.App. 1995). Yvonne then filed this appeal.[1]

"When a party seeks to modify a divorce decree respecting maintenance or support pursuant to KRS 403.250, the moving party has the burden of proving a change of circumstances so substantial and continuing as to make the terms of the decree unconscionable." *Wilcher v. Wilcher*, 566 S.W.2d 173, 175 (Ky.App. 1978). We review an order resolving a motion to modify, or terminate, maintenance under the deferential abuse of discretion standard. *See, e.g.*, *Block v. Block*, 252 S.W.3d 156, 159 (Ky.App. 2007). We may disturb factual findings only if they are clearly erroneous, but we review issues of law *de novo*. *Id.*

While we recognize that William filed a motion to terminate, not modify, maintenance, "KRS 403.250 expressly speaks to modification of maintenance, without distinguishing between termination and reduction of an existing award. Thus, a motion to terminate maintenance necessarily encompasses all lesser relief, including a reduction or modification of an open maintenance award." *Bickel v. Bickel*, 95 S.W.3d 925, 930-31 (Ky.App. 2002).

KRS 403.250 provides in relevant part:

(1) Except as otherwise provided in subsection (6) of KRS 403.180, the provisions of any decree respecting maintenance may be modified only upon a showing

---

[1] We have examined all the parties' arguments, but we will not address those which are redundant, irrelevant, or otherwise without merit.

of changed circumstances so substantial and
continuing as to make the terms unconscionable. . . .

(2) Unless otherwise agreed in writing or expressly
provided in the decree, the obligation to pay future
maintenance is terminated upon the death of either
party or the remarriage of the party receiving
maintenance.

We begin by addressing the different types of situations when
cohabitation can result in the termination of maintenance and how KRS 403.250
does or does not apply. There are three general factual scenarios: (1) neither the
parties' settlement agreement (if there is one) nor the family court's judgment or
dissolution decree ever mentions that termination of maintenance will or may
result from cohabitation; (2) the parties' settlement agreement (incorporated in the
family court's judgment or dissolution decree) provides that cohabitation does or
can terminate maintenance; or (3) only the family court's judgment or dissolution
decree provides that maintenance will or may be terminated by subsequent
cohabitation.

In the first scenario, epitomized by the Kentucky Supreme Court's
opinion in *Combs*, neither a settlement agreement nor the dissolution decree
provided for the termination of maintenance based on cohabitation. In *Combs*, the
former husband filed a motion to terminate maintenance due to the former wife's
cohabitation with another in a relationship that he claimed was the functional
equivalent of marriage, pursuant to KRS 403.250(2). *Combs*, 787 S.W.2d at 261.

The trial court refused to terminate maintenance pursuant to KRS 403.250(2), but instead considered whether the cohabitation provided for a change of circumstances pursuant to KRS 403.250(1) rendering continued maintenance unconscionable, concluded that it did, and reduced the maintenance payments to zero. *Combs*, 787 S.W.2d at 261. The Kentucky Supreme Court upheld this decision, concluding that "a maintenance recipient's cohabitation can render continued maintenance 'unconscionable' if the nature of the cohabitation constitutes a new 'financial resource' as contemplated in KRS 403.200(2)(a)." *Id*. However, in doing so it explained:

> We recognize that not every instance of cohabitation constitutes a change in circumstances making continued maintenance "unconscionable." We do not intend by this opinion to open the floodgates to motions to terminate or suspend maintenance payments in every situation in which the maintenance recipient has begun dating, or has formed casual relationships with persons of the opposite sex. While each case stands on its own, the elements to consider are:
>
> 1. Duration – It should never be the intention of the Court to allow for maintenance reduction based upon casual "overnights" or dating. A showing of substantially changed circumstances under KRS 403.250(1) based upon cohabitation, necessarily involves proof of some permanency or long-term relationship.
>
> 2. Economic Benefit – The relationship must be such to place the cohabitating spouse in a position which avails that spouse of a substantial economic benefit. The scope and extent of the economic benefit should

-7-

be closely scrutinized. If the "cohabitation" does not change the cohabitating spouse's economic position, then reductions should not be permitted.

3. Intent of the Parties – Does it appear that the cohabitating spouse is avoiding re-marriage to keep maintenance? Does it appear from the circumstances that the cohabitating parties intend to establish a "lasting relationship?"

4. Nature of the Living Arrangements – Does it appear that the cohabitation is merely a space sharing situation or is there one common household?

5. Nature of the Financial Arrangements – Is there a "pooling of assets?" Is there actually a joint or team effort in the living arrangement? Who pays the bills and how are they paid?

6. Likelihood of a Continued Relationship – Does it appear that the relationship will continue in the future? Do the parties intend the relationship to continue indefinitely?

*Id*. *See also Barnett v. Wiley*, 103 S.W.3d 17, 19-20 (Ky. 2003) (discussing similar factors to determine if persons cohabited for purposes of domestic violence statutes).

The Kentucky Supreme Court in *Combs* specifically clarified that it was rejecting the supposition that cohabitation could be considered the equivalent of marriage pursuant to KRS 403.250(2) and, thus, be subject to automatic termination, explaining "[i]f the legislature wants to make a policy decision to automatically terminate maintenance upon a recipient's cohabitation, then it should

-8-

amend KRS 403.250(2) to add cohabitation as a ground[] for automatic termination." *Combs*, 787 S.W.2d at 263.

As the General Assembly has not acted, we continue to be bound by this cautious approach in which cohabitation is not equated to remarriage. We believe courts should rightly be cautious of terminating or reducing maintenance whether it was the lower court or the parties themselves that agreed maintenance was appropriate.[2]

In the second scenario, epitomized by the Kentucky Supreme Court's opinion in *Cook v. Cook*, 798 S.W.2d 955, 956 (Ky. 1990), and the Court of Appeals' opinions in *Block*, 252 S.W.3d at 157, and *Bennett v. Bennett*, 133 S.W.3d 487 (Ky.App. 2004), the property settlement agreements provided for termination or potential termination of maintenance upon cohabitation, and

---

[2] We recognize that when family courts incorporate settlement agreements providing for maintenance into dissolution decrees, those courts generally do not make an independent analysis of the propriety *or* amount of maintenance. Without prior findings of fact on those issues, and without there being a full context or basis for the parties' agreement on maintenance such that the court would be able to presently appreciate and weigh the parties' original circumstances, courts must be hesitant to invade the parties' negotiations and contractual agreements. For example, the payment of future maintenance is often utilized in lieu of the present payment of the full share of marital property (small businesses, pensions, social security, *etc*.) or the restitution of non-marital interests. In such circumstance, before a family court determines that an unconscionable, substantial, and continuing change has occurred, it must first "compare the parties' current circumstances to those at the time the court's separation decree was entered" in comportment with *Tudor v. Tudor*, 399 S.W.3d 791, 793 (Ky.App. 2013). Negotiated maintenance awards should not be reduced if it is evident that maintenance was provided to equitably divide the marital property or restore non-marital property rather than to provide ongoing necessary support.

therefore rules of contract interpretation would take precedence. The specific language agreed upon by the parties in their settlement agreement regarding cohabitation and termination of maintenance results in different analysis and applications of the law.

In *Cook*, the property settlement agreement provided that maintenance was payable until a termination date but would end sooner if the former wife "begins cohabitation with a non-relative adult male[.]" *Cook*, 798 S.W.2d at 956. The testimony established that although the wife and her paramour had an exclusive sexual relationship, they maintained and resided in separate residences and paid their own living expenses; while this couple spent time together almost every evening in the wife's home, the paramour returned to his own home to spend the night. *Id.* at 956-57. Given these facts, the Kentucky Supreme Court considered the definition of "cohabitation" contained in the Fifth Edition of *Black's Law Dictionary* which provides: "To live together as husband and wife. The mutual assumption of those marital rights, duties, and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations." *Cook*, 798 S.W.2d at 957. The Court concluded the conduct of the wife and her paramour did not satisfy this definition. *Id.* The Court also opined that if the language of the contract alternatively prohibited cohabitation

defined as "living in the same house[,]" the wife's conduct with her paramour did not satisfy this definition, either. *Id.*

The *Cook* Court concluded that *Combs* was not applicable to the situation before it because in *Combs* there was no issue that cohabitation had occurred; the issue was whether such cohabitation constituted a change in circumstances sufficient to make continuing payments "unconscionable" under KRS 403.250(1). Conversely, the issue before the Kentucky Supreme Court in *Cook* was one of contract interpretation in determining "whether there has been 'cohabitation' which would automatically terminate maintenance under the terms of the contract" (*i.e.*, the parties' marital settlement agreement). *Cook*, 798 S.W.2d at 957.

Similarly, in *Bennett*, 133 S.W.3d at 488, the settlement agreement provided that the obligation to pay maintenance would terminate upon the wife's cohabitation. When the husband learned that the wife's paramour was sleeping with her in her home every night beginning in July 2001, he filed a motion to terminate maintenance, which was granted in January 2003, effective as of July 2001. *Id.* at 488-89. The Court of Appeals concluded that under the undisputed facts the paramour spent every night with the wife in her house unless he happened to be out of town on business and she did not accompany him; therefore, the wife's

relationship with her paramour "qualifies as cohabitation whether considered in light of sexual involvement or living in the same house." *Id.* at 490.

The Court of Appeals in *Bennett* further concluded that it was appropriate for the trial court to determine that the wife and her paramour began living together in July 2001 because the settlement agreement did not indicate that the parties intended "cohabitation" to have any special meaning beyond the ordinary meaning of the word, which usually means a couple living together and not married to one another (as three dictionaries provided), rather than living together as husband and wife. *Id.* at 491.

In *Block*, in contrast to *Cook* and *Bennett*, the settlement agreement provided that if the former wife should ever "reside [] with a member of the opposite sex not related to her by blood," the court could entertain a motion to modify maintenance as a result of the alleged cohabitation, and in such a review "the provisions of KRS 403.250 would control." *Block*, 252 S.W.3d at 157. In *Block*, the wife's paramour moved into her condominium, they then jointly purchased a home with him advancing her money for her portion of the share of the purchase price, she repaid him, they jointly purchased furniture and a boat, had joint insurance on their vehicles, their written partnership agreement provided that their joint property will devolve to the other under a right of survivorship provision, they had a joint checking account to pay joint household expenses, and

-12-

they had a commitment ceremony. *Id.* at 157-58. The family court denied the

husband's motion to modify his maintenance obligation because the family court

decided that the wife only received "some" financial benefit from her relationship,

which was insufficient to meet the *Combs* standard. *Block*, 252 S.W.3d at 159.

In reversing, the Court of Appeals in *Block* noted that separation

agreements[3] are enforceable contracts and that it was evident "that the parties

contemplated that Mrs. Block's cohabitation *may* result in modifying

maintenance." *Id.* at 160 (emphasis added). The Court observed "one principle is

exceedingly clear from the caselaw: absent a provision otherwise in a separation

agreement, cohabitation is only one factor to consider in reviewing modification of

maintenance cases." *Id.* at 161.

As the parties' agreement did not contain a provision which would

cause maintenance to terminate automatically upon cohabitation, and instead stated

KRS 403.250 would control, the Court of Appeals in *Block* applied the *Combs*

factors, explaining that "[w]e believe that the holding in *Combs* is that each of the

factors should be considered, but that *Combs* requires that the cohabitation must

result in a change in the cohabiting spouse's economic position before a

modification of maintenance is in order." *Block*, 252 S.W.3d at 161-62 (footnote

---

[3] The Court of Appeals appears to have been using the term "separation agreement" as synonymous with "settlement agreement." We believe that either type of agreement as incorporated into a dissolution decree should be treated the same.

omitted).  The Court rejected the family court's conclusion that the former wife was only enjoying "*some* economic benefit" where she saved money living with her paramour and had full access to a house and boat for which she had only paid half the cost, had a substantially reduced cost of housing, and no longer owes mortgage payments.  *Id.* at 162.  The Court explained that all the factors favored modification of maintenance to zero.  *Id.* at 163.

In the third scenario, epitomized by *Castle v. Castle*, 266 S.W.3d 245, 247-48 (Ky.App. 2008), the circuit court itself established an open-ended maintenance award that provided maintenance would terminate if the wife cohabited.  The Court of Appeals concluded that when it is the circuit court that imposed a cohabitation limitation on maintenance (rather than the parties by agreement), the award can only be modified if the circumstances evidence a change of circumstances "so substantial and continuing as to make the terms of the award unconscionable."  *Id.* at 248.  The Court cited *Massey v. Massey*, 220 S.W.3d 700 (Ky.App. 2006), as supporting its conclusion that this interpretation is necessary to prevent such a condition from being in contravention of KRS 403.250(1).  *Castle*, 266 S.W.3d at 248.  In *Massey*, the Court of Appeals explained that "[t]he family court simply cannot impose modification terms upon an open-ended maintenance award not authorized by KRS 403.250(1)."  *Massey*, 220 S.W.3d at 703.

-14-

The Court of Appeals in *Castle* also noted with approval that the circuit court "considered the cohabitation issue under the unconscionability provisions of KRS 403.250(1)" and "made a specific evidentiary finding that [the wife's] cohabitation relationship was inequitable and specifically found the existence of changed circumstances sufficient to make the payment of maintenance unconscionable." *Castle*, 266 S.W.3d at 248. The Court emphasized that "[w]hile the cohabitation restriction itself may have been unenforceable absent an agreement between the parties, the circuit court still made sufficient findings to warrant the termination of maintenance under KRS 403.250." *Id.*

It is this third scenario which applies here as it was the family court that imposed the condition that maintenance would terminate upon cohabitation. However, other aspects of the cases in the other categories are also relevant. Because the clause providing for automatic termination of maintenance upon cohabitation with a romantic partner was not the result of a negotiated settlement agreement between William and Yvonne, to avoid running afoul of KRS 403.250 the family court had to first determine whether Yvonne and Craig were "cohabiting" and then whether such cohabitation rendered "continued maintenance 'unconscionable'" because "the nature of the cohabitation constitutes a new 'financial resource' as contemplated in KRS 403.200(2)(a)." *Combs*, 787 S.W.2d at 262.

Initially we address whether the family court properly concluded that Yvonne cohabited with Craig. We are unaware of what definition the family court applied to determine whether Yvonne was cohabiting with Craig. We believe that the *Black's Law Dictionary* definition as considered in *Cook* was a proper definition to consider and is consistent with the *Combs* factors, but that other dictionary definitions may have merited consideration as well as noted in *Bennett*. While the *Black's Law Dictionary* definition speaks of living together as husband and wife, cohabitation is legally distinct from marriage as Kentucky does not allow cohabitation to result in a common law marriage,[4] and indeed in *Combs* the Court rejected an attempt to have cohabitation be treated as marriage pursuant to KRS 403.250(2). Other definitions require living together in one residence (with or without sexual relations).

---

[4] There is no artificial form of marriage recognized in Kentucky and the idea of the legal recognition of such unions has been rejected by our legislature since the advent of the Kentucky Revised Statutes. As stated over a hundred and fifty years ago, albeit in a unique case involving whether the cohabitation-based marriage of two former slaves was a legally binding marriage after slavery was finally abolished, "*there is now no law in Kentucky to legalize cohabitation . . . as marriage*, the common and *only* law to that effect having been repealed." *Estill v. Rogers*, 1 Bush 62, 64 Ky. 62, 65 (1866) (enslaved parties) (emphasis original). That distinction remains in effect, with the only exception being Kentucky's deference to the laws of other states, where parties previously resided, recognizing their marital status in Kentucky. Kentucky has devoted an entire chapter, KRS Chapter 402, to defining, with particularity, each of the requirements which must be met in order for a couple to be legally married and recognized as "united in law for life." KRS 402.005. We must conclude that the General Assembly has determined the public would be better served by maintaining clarity, as shown by its statutes, between marriages and any other form of living arrangement.

The family court in terminating William's maintenance obligation did not clarify whether Yvonne and Craig had a romantic relationship in which they either essentially lived together as husband and wife or lived together at the same residence. We believe there is a distinction between engaging in "sleepovers" and having a shared residence. The family court held that Yvonne had cohabited because "[Craig] spent almost every night with [Yvonne] at her residence, had unfettered access to her home and vehicles, and the parties were in an intimate relationship. The actions of [Craig and Yvonne] point to sharing a home, vehicles, travel, and intimacy. All indicative of cohabitation." It is unclear to us what definition of cohabitation the family court was using, that it even considered what definition should apply or simply applied its own, or whether the actions of Yvonne and Craig conformed to such a definition or were simply assumed to do so. Without any further definition for cohabitation contained in a decree of dissolution, we believe it would be appropriate to conclude that the *Black's Law Dictionary* adopted by our highest court in *Cook* was intended to apply and applying another definition would at the very least require some additional analysis.

We question whether William presented sufficient evidence to show that Yvonne and Craig cohabited under any definition of "cohabitation." Sexual relations, overnight visits, and occasional trips together are hallmarks of modern

dating; these actions alone do not meet either definition of cohabitation. However, we are a court of review, not an initial factfinder. Therefore, we vacate and remand with instructions for the family court to consider what definition of "cohabitation" should apply, and then given that standard, determine anew if Yvonne cohabited with Craig.

If, on remand, the family court again concludes that Yvonne cohabited with Craig, this is only the first step needed in an analysis as to whether maintenance should be terminated, because it is the effects of the cohabitation and the scope of the arrangement, not the act in and of itself, which determines whether or not maintenance should be modified pursuant to *Combs* and KRS 403.250(1). As explained in *Castle*, the family court's imposition of a cohabitation maintenance termination clause cannot be treated the same as if such a clause were negotiated between the parties. Standing alone and without the parties' agreement, "cohabitation is not grounds under the statute to terminate maintenance[.]" *Bennett*, 133 S.W.3d at 489 (construing *Combs*).[5] Therefore, the family court erred by terminating maintenance based solely upon the automatic termination clause.

---

[5] The parties each cite sundry unpublished opinions addressing the issue of whether a court may automatically terminate maintenance based solely on cohabitation, absent agreement by the parties, but we decline to address any unpublished opinions because the issue is sufficiently addressed by published precedent.

The family court declined to address the *Combs* factors because it viewed *Cook*, 798 S.W.2d 955, as controlling – thus, in its view, making *Combs* irrelevant. The parties continue to disagree over whether *Cook* or *Combs* applies. Actually, both do.

We have already discussed *Cook*'s applicability in determining whether cohabitation has occurred. But *Cook* does not address whether cohabitation should result in termination of maintenance because the parties in *Cook* had agreed that it would under the terms of their settlement agreement. Therefore, the family court erred by stating in its order denying Yvonne's motion to alter, amend, or vacate that "[t]he fact that the maintenance obligation was set by contract in *Cook* is irrelevant." To the contrary, the entire fundamental basis for the holding in *Cook* is that the parties had contractually agreed to terminate maintenance upon cohabitation. As we have explained, when it is the family court that imposes the condition that maintenance will terminate upon cohabitation, under *Castle* the family court cannot simply graft on another condition to KRS 403.250(2) but must instead determine that the cohabitation satisfies the unconscionability provisions of KRS 403.250(1) as established by meeting the factors set forth in the *Combs* test. Therefore, on remand, if the family court again concludes that Yvonne cohabited with Craig, it must apply and discuss the *Combs*

-19-

factors to determine if it would be unconscionable for her to continue to receive previously awarded maintenance.

Finally, given our decision on cohabitation and automatic termination of maintenance, we must also vacate the family court's secondary conclusion that the termination would be retroactive to the date William submitted his motion. While Yvonne's argument that the retroactive termination was improper is now technically moot, for the benefit of the court and parties on remand, we will briefly address it.

The basis for Yvonne's argument against retroactivity is the statement in *Combs* that "maintenance payments are vested from the entry of a decree and ordinarily can be modified only upon the entry of a subsequent order of the Court to operate prospectively, from the date of entry." *Combs*, 787 S.W.2d at 263.

Of course, there is inevitably a gap between the filing of a motion and a ruling thereon. Therefore, albeit unfortunately without analyzing the language in *Combs*, we have held that "our law does not prohibit a trial court from granting a retroactive reduction of maintenance for the period of time from the filing of the motion to the entry of judgment." *Mudd*, 903 S.W.2d at 534. The decision to reduce or eliminate maintenance retroactive to the date a motion seeking that relief was filed is within the trial court's discretion. *Id.*

In other words, a family court has the ability to, after considering the relevant facts and circumstances, amend or terminate a maintenance obligation retroactively.[6] For example, the family court could consider whether the delay in ruling on the motion was unreasonably caused, or extended, by the payee's actions or inactions since a payee should not benefit from an unreasonable delay which he or she caused.

We do not perceive our holding in *Mudd* to contravene *Combs* because a payee does not have a right to receive payments to which he or she is not entitled, and the filing of a motion to reduce or terminate maintenance shows – or at least puts all concerned on notice – that it is no longer conscionable for the payee to receive the previously ordered amount of maintenance. *See Bennett*, 133 S.W.3d at 488-89 (reciting that the circuit court ultimately ruled that it was appropriate for maintenance to terminate as of the date that the wife cohabitated, with the parties apparently not challenging this aspect of the decision).

The conclusion that retroactive termination is appropriate in certain circumstances also aligns well with basic fairness and equity. Precedent from our Supreme Court makes plain that a court can order maintenance payments to begin

---

[6] While spousal maintenance and child support payments were traditionally both considered to be vested when due, spousal maintenance is now treated differently pursuant to *Mudd*. As to child support, compare with *Price v. Price*, 912 S.W.2d 44, 46 (Ky. 1995).

retroactively from the date a party sought such relief. *Higbee v. Higbee*, 89 S.W.3d 409, 410 (Ky. 2002). Since a court has the discretion to order maintenance payments to begin retroactively, it should also have the corresponding discretion to order maintenance payments to be terminated retroactively. *See Borders Self-Storage & Rentals, LLC v. Transportation Cabinet, Department of Highways*, 636 S.W.3d 452, 456 (Ky. 2021) ("The rule of law should, in the interest of justice and fairness, cut both ways since 'what is sauce for the goose is sauce for the gander.'").

Here, the monthly maintenance payments were large and there was an unusually lengthy gap between when William filed his motion and when it was granted. Therefore, the retroactive nature of the family court's ruling resulted in Yvonne owing William a substantial sum. If the family court again terminates William's maintenance obligation, it shall address the relevant facts and circumstances (such as Yvonne's financial status and the reasons for the lengthy delay in its issuance of a ruling) before deciding whether it is equitable for the termination to be made retroactive.

Accordingly, we vacate the Oldham Family Court's order terminating William's maintenance obligation to Yvonne and ordering her to repay him and remand for more specific findings and rulings after applying the applicable law.

-22-

ALL CONCUR.

BRIEFS FOR APPELLANT:

James L. Theiss
James Daniel Theiss
La Grange, Kentucky

BRIEF FOR APPELLEE:

Randall L. Wright
Louisville, Kentucky