Laconia Family Division
No. 2010-876

IN THE MATTER OF JUDITH RAYBECK AND BRUCE RAYBECK

Argued: February 15, 2012
Opinion Issued: May 11, 2012

*FamilyLegal*, of Concord (*Gregory A. Kalpakgian* on the brief, and *Jay D. Markell* orally), for the respondent.

*Law Office of Joshua L. Gordon*, of Concord (*Joshua L. Gordon* on the brief and orally), for the petitioner.

LYNN, J. The respondent, Bruce Raybeck, appeals an order of the Laconia Family Division (*Sadler*, J.), recommended by the Marital Master (*Garner*, M.), ruling that the respondent was required to continue paying alimony to the petitioner, Judith Raybeck. We vacate and remand.

I

The relevant facts are as follows. The parties were divorced in Texas in August 2005 after a forty-two-year marriage. The respondent was awarded property in North Carolina and Texas, and the petitioner was awarded property in Laconia, New Hampshire. The divorce decree, based upon the parties' agreement, obligated the respondent to pay the petitioner alimony of $25,000 per year for ten years, in yearly installments. That obligation would cease, however, if the petitioner "cohabitates with an unrelated adult male."

Approximately three months before the January 2010 alimony payment was due, the petitioner moved out of her Laconia house and rented it to reduce her expenses. She moved into the upper level of a single family home in Plymouth owned by Paul Sansoucie, a man she had met through an online dating service. Sansoucie lived on the lower level and did not charge the petitioner for rent. She did, however, pay about $300 per month for food and often cooked for him. They also shared living space on the middle level of the house. When the respondent learned that the petitioner lived with another man, he stopped paying alimony. In response, the petitioner asked the family division to enforce the alimony agreement and require the respondent to resume his support payments.

After a hearing, the marital master recommended a finding that the petitioner was not cohabiting with Sansoucie under the terms of the divorce decree, and the family division approved the recommendation ordering the respondent to continue his alimony payments. This appeal followed.

II

In his brief, the respondent argues that the court erred as a matter of law in concluding that the petitioner was not cohabiting with Sansoucie under

the terms of the divorce decree. The respondent abandoned that argument at oral argument, however, arguing instead that "the trial court below was not able to establish a workable definition of what constitutes cohabitation," and asking this court to adopt a standard of cohabitation enacted recently by legislative initiative in Massachusetts. *See An Act Reforming Alimony in the Commonwealth*, 2011 Mass. Acts 124 (H.B. 3617, ch. 124 § 49(d)). [*] The petitioner argues that the trial court acted within its discretion in concluding that she was not cohabiting with another man as that term was intended in the divorce decree.

In reviewing the trial court's ruling, we accept its factual findings unless they lack support in the record or are clearly erroneous. *State v. Michelson*, 160 N.H. 270, 272 (2010). The application of the appropriate legal standard to those facts, however, is a question of law, which we review *de novo. Id.*

Neither the legislature nor this court has had occasion to define "cohabitation" as that term is often used in a divorce decree. Because the divorce decree here reflects the parties' agreement, we will interpret the cohabitation clause according to its common meaning. *See Kessler v. Gleich*, 161 N.H. 104, 108 (2010). The trial court applied the following standard:

> [E]vidence of a sexual relationship is admissible, but not necessarily required, for a finding of cohabitation. . . . [T]here must be more to the relationship than just occupying the same living area or sharing some or all of the expenses incurred by both

---

[*] That Act provides, in section 49(d), that:

(d) General term alimony shall be suspended, reduced or terminated upon the cohabitation of the recipient spouse when the payor shows that the recipient has maintained a common household, as defined below, with another person for a continuous period of at least 3 months.

(1) Persons are deemed to maintain a common household when they share a primary residence together with or without others. In determining whether the recipient is maintaining a common household, the court may consider any of the following factors:

(i) oral or written statements or representations made to third parties regarding the relationship of the cohabitants;

(ii) the economic interdependence of the couple or economic dependence of 1 party on the other;

(iii) the common household couple engaging in conduct and collaborative roles in furtherance of their life together;

(iv) the benefit in the life of either or both of the common household parties from their relationship;

(v) the community reputation of the parties as a couple; or

(vi) other relevant and material factors.

parties. The evidence should reflect a common and mutual purpose to manage expenses and make decisions together about common and personal goals, and a common purpose to make mutual financial and personal progress toward those goals.

Applying this definition, the court concluded that the petitioner and Sansoucie did not cohabit. In support of that decision, the court found, among other facts, that the petitioner was forced to relocate when the respondent first announced that he would discontinue the alimony payments; that she and Sansoucie sleep on different floors of the house although they do share a common living area; that she does not pay rent but pays for food; and that their financial relationship is limited to her paying for food in exchange for shelter. The court also found, however, evidence indicating that there was a personal component to their relationship. They had, for example, shared rooms during their travels together. In a letter to her children, the petitioner stated that she and Sansoucie had discussed marriage but did not marry for "personal and financial reasons." Specifically, the petitioner wrote that "neither of us is sure if we want to remarry. Financial matters become so complicated at our age. . . ." The record also reflected that the petitioner's son-in-law referred to Sansoucie as the petitioner's boyfriend in a Christmas letter. Notwithstanding the evidence of a personal connection, the trial court ruled that the petitioner and Sansoucie did not cohabit in light of their financial situation.

Our common law lacks a definition of cohabitation as that term is used in divorce decrees and separation agreements. Dictionary definitions confirm the trial court's conclusion that to qualify a living arrangement as one of cohabitation there must be a personal connection beyond that of roommates or casual bedfellows. BLACK'S LAW DICTIONARY, for example, defines cohabitation as "[t]he fact or state of living together, esp[ecially] as partners in life, usu[ally] with the suggestion of sexual relations." BLACK'S LAW DICTIONARY 296 (9th ed. 2009). THE OXFORD ENGLISH DICTIONARY defines it as "liv[ing] together as husband and wife, esp[ecially] without legal marriage." 1 OXFORD ENGLISH DICTIONARY 447 (6th ed. 2007). BALLENTINE'S LAW DICTIONARY defines it as "a dwelling together of a man and a woman in the same place in the manner of husband and wife." BALLENTINE'S LAW DICTIONARY 214 (3d ed. 1967); *see also* THE NEW OXFORD AMERICAN DICTIONARY 330 (2d ed. 2005) ("live together and have a sexual relationship without being married"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 440 (unabridged ed. 2002) ("[T]o live together as or as if as husband and wife. The mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations.").

Common law standards from other jurisdictions contain similar articulations. *See, e.g., State v. Arroyo*, 435 A.2d 967, 970 (Conn. 1980) ("[Cohabitation] is the mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations."); *Cook v. Cook*, 798 S.W.2d 955, 957 (Ky. 1990) (cohabitation is "mutually assum[ing] the duties and obligations normally assumed by married persons"); *Fisher v. Fisher*, 540 A.2d 1165, 1169 (Md. Ct. Spec. App. 1988) (cohabitation "envisions at least the normally accepted attributes of a marriage"); *Frey v. Frey*, 416 S.E.2d 40, 43 (Va. Ct. App. 1992) (cohabitation "has been consistently interpreted by courts as encompassing both a permanency or continuity element and an assumption of marital duties"); *see also Gordon v. Gordon*, 675 A.2d 540, 546 n.8 (Md. 1996) (rejecting proposition that cohabitation is synonymous with common residence). Similarly, CORPUS JURIS SECUNDUM states: "Generally, where alimony is sought to be modified on the basis of cohabitation with another by the recipient spouse, cohabitation is an arrangement in which the couple reside together on a continuing conjugal basis or hold themselves out as man and wife." 27B C.J.S. *Divorce* § 656, at 334 (2005). The notes of that treatise elaborate: "Where the term 'cohabitation' is used in a divorce decree . . . , court must look to whether the parties have assumed obligations, including support, equivalent to those arising from a ceremonial marriage." *Id.*

■ After carefully reviewing these authorities, we follow them in defining cohabitation as a relationship between persons resembling that of a marriage. As such, cohabitation encompasses both an element of continuity or permanency as well as an assumption of marital obligations. *Cf. Frey*, 416 S.E.2d at 43. As the trial court recognized, whether two people are cohabiting will depend on the facts and circumstances of each particular case. Beyond living together on a continual basis, many factors are relevant to the inquiry. Primary among them are the financial arrangements between the two people, such as shared expenses, whether and to what extent one person is supporting the other, the existence and use of joint bank accounts or shared investment or retirement plans, a life insurance policy carried by one or both parties benefiting the other, and similar financial entanglements.

■ We observe, however, that, in considering the financial arrangements, the age of the putative couple may be an important consideration. Where, as here, the individuals are senior citizens, support of one by the other may have less significance than with younger people not only because older individuals may be more financially secure than their younger counter-

parts, but also because older individuals may have estate plans in place to benefit children of prior relationships.

■ Also important is the extent of the personal relationship, including evidence of an intimate connection, how the people hold themselves out to others, the presence of common friends or acquaintances, vacations spent together, and similar signs of an ongoing personal commitment. Evidence of a sexual relationship should also be considered, but is not dispositive. Here too, the age of the couple may be relevant in weighing this factor; for older people, a sexual component to intimacy may not be as significant as it would be for younger couples.

■ In addition, the shared use and enjoyment of personal property is an indication of cohabitation, such as common use of household rooms, appliances, furniture, vehicles, and whether one person maintains personal items, such as toiletries or clothing, at the residence of the other. So, too, are indications that family members and friends view the relationship as one involving an intimate personal commitment. Taken together, these factors will support a finding of cohabitation if they indicate that two people are so closely involved that their relationship resembles that of marriage.

Because the trial court did not have the benefit of the standard we articulate here for determining whether the relationship between the petitioner and Sansoucie amounted to cohabitation, we vacate and remand the case for the master to reconsider the matter in light of the standard we have established.

*Vacated and remanded.*

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred.