**Opinion issued June 26, 2025**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-24-00734-CV**

———————————

**DAVID BEGALA, Appellant**

**V.**

**REBECCA BEGALA, Appellee**

**On Appeal from the 308th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-31974**

**O P I N I O N**

This case involves spousal maintenance, a device that did not even exist in

Texas law until 1995. In the years leading up to those statutory changes, Texas held

a dim view toward anything looking too much like alimony. *See, e.g.*, *Dalton v.*

*Dalton*, 551 S.W.3d 126, 130 (Tex. 2018); *Francis v. Francis*, 412 S.W.2d 29, 32–33 (Tex. 1967). Family Code Chapter 8 opens the door a bit to spousal maintenance, but with fairly strict limitations:

> In 1995, the Texas Legislature first authorized courts to award a form of involuntary post-divorce alimony referred to as "spousal maintenance." But Chapter 8 of the Family Code allows spousal-maintenance awards only under "very narrow" and "very limited circumstances." The former spouse must be "eligible" to receive spousal maintenance; the "duration" and "amount" of the payments must not exceed specified limits; the obligation must automatically terminate upon certain events; and the court must consider a wide variety of factors to "determine the nature, amount, duration, and manner of periodic payments."

*Dalton*, 551 S.W.3d at 130–31 (Tex. 2018) (footnotes and citations omitted). For example, Chapter 8 generally limits the duration of the monthly maintenance payments to either five years, seven years, or (at most) ten years, depending on how long the parties were married. *See* TEX. FAM. CODE § 8.054(a). This case raises a question about the rules for automatic termination of a maintenance award.

Section 8.056 cuts off a spousal maintenance obligation if the party receiving the payments does one of the following three things:

- dies,
- remarries, or
- engages in a certain kind of cohabitation.

2

*Id.* § 8.056(a)–(b). Deciding whether somebody died or remarried is simple, but analyzing someone's living arrangements can become an awkward and unseemly task.[1]

For better or worse, however, the statute declares that the obligation will terminate if "the obligee cohabits with another person with whom the obligee has a dating or romantic relationship in a permanent place of abode on a continuing basis." *Id.* § 8.056(b). "*Cohabits . . . in a permanent place of abode on a continuing basis.*" What do those words mean?

This question matters because appellant David Begala invokes section 8.056(b) as authority for ending his $5,000 per month maintenance obligation to his ex-wife, appellee Rebecca Begala. He says that Rebecca resided with her boyfriend for 116 days. To bolster this claim, he notes that in response to requests for admissions, Rebecca admitted to staying overnight "continuously" at her boyfriend's house for 60 days or more.

Rebecca reads the statute differently and also sees events differently. What David calls cohabitation she calls something else. One of her exhibits describes this 116-day stay as "temporarily resid[ing]" at her boyfriend's home "while waiting for the previous owners of" a duplex she had just bought "to move out and for

---

[1]    *See* Cynthia Lee Starnes, *I'll Be Watching You: Alimony and the Cohabitation Rule*, 50 FAM. L.Q. 261, 300 (Summer 2016) ("[C]ourts charged with enforcing cohabitation rules struggle to identify cohabitation . . . .").

renovations to be completed at" the duplex. She testified that she did not wish to stay in her apartment during the 116 days while the renovations were in process. As for answering the request for admissions, she does not equate staying overnight for 60 days or more as cohabitation "on a continuing basis." To her, staying with another person does not mean living with him.

The trial court denied David's motion to terminate the maintenance obligation. David challenges this ruling in two issues on appeal, arguing that Rebecca's conduct met the requirements of section 8.056(b): she cohabited with her boyfriend in a permanent place of abode on a continuing basis.

We reverse and render judgment terminating David's maintenance obligation.

## Background

David and Rebecca married in 1995. Rebecca sought a divorce in 2017. The divorce proceeding lasted for years, and Rebecca moved back to her home state of Ohio during the proceeding. The trial court signed a final divorce decree in April 2022. In the property division, the court awarded Rebecca assets that included over $331,000 in a bank account, all or half of five other financial accounts, an individual retirement account, a vehicle, and a $250,000 payment from David.

As part of the divorce decree, the trial court ordered spousal maintenance at the statutory maximum of $5,000 per month from March 2022 until February 2029. *See id.* § 8.055(a) ("A court may not order maintenance that requires an obligor to

pay monthly more than the lesser of (1) $5,000; or (2) 20 percent of the spouse's average monthly gross income."). The decree states that maintenance shall end at the earliest of any of the following:

- February 2, 2029
- Either party's death
- Remarriage by Rebecca
- Cohabitation by Rebecca

Neither party appealed from the 2022 divorce decree.

A year and a half later, however, David moved to terminate his maintenance obligation. His January 2024 petition invoked section 8.056(b) and alleged cohabitation. Specifically, David alleged that Rebecca had "been living with her boyfriend, David Markley," at his house in a Cleveland, Ohio suburb, and that over "the past twenty-eight days, she has consistently stayed at this address overnight, seldom venturing out except for occasional trips to places like Starbucks" or "for daytime shopping." He alleged that Rebecca's absences from Markley's house "are infrequent and typically short, often returning multiple times throughout the day, even during more extended shopping outings." David further alleged that Rebecca had not returned to her own home, a condominium located in another nearby suburb of Cleveland, "in over a month."

The trial court held an evidentiary hearing. The evidence consisted of a few dozen exhibits and testimony from two witnesses: Rebecca and David. Of those two

witnesses, only Rebecca really had anything to say about the key issue, because David had no personal knowledge on the matter.

Rebecca had a residence of her own: a condominium that she had under lease until the end of February 2024. But in November 2023, she bought a duplex where she could live on the lower floor and rent out the upper part. In anticipation of the move, Rebecca packed up her belongings in her condo and disassembled her furniture. Unfortunately, her plans to move immediately into the duplex ran into two problems. First, the prior owners failed to vacate as soon as anticipated. Second, the duplex needed "extensive" renovations. Because she had already packed her belongings in the condo, she decided to stay with Markley at his house until the duplex renovations wrapped up. Renovations were not completed until late February 2024.

David's counsel questioned Rebecca about staying with Markley from November 2023 through February 2024 and referenced some of Rebecca's discovery responses during the questioning:

> Q    On November 2nd of 2023, you began temporarily staying overnight at the home of David Markley; is that correct?
>
> A    Yes.
>
> . . . .
>
> Q    And in that last paragraph [of Rebecca's disclosures] right there, you see where you say that, "You briefly and temporarily stayed overnight with David Markley prior to occupying the [duplex]," do you see that?

A    I do.

Q    And so that would have been from November 2nd of 2023 until, by what you said, you moved in [to the duplex] on February 26th of 2024; is that correct?

A    That's correct.

Q    Ma'am, do you believe that staying overnight every single night for 116 days is briefly and temporary?

A    Yes, I do.

. . . .

Q    And, ma'am, do you see [request for admission] No. 19 where it asked, "If you stayed overnight at David Markley's residence for 30 days or more continuously since April 25th of 2022 [the date of the final divorce decree]," do you see that?

A    Yes.

Q    And, ma'am, what's your answer?

A    I admitted it.

Q    All right. So let's look at No. 20. This one says that, "You stayed overnight at David Markley's residence for 60 days or more continuously since April 25th of 2022." Do you see that?

A    I do.

Q    And, ma'am, what was your answer?

A    "Admit."

. . . .

Q    So other than vacations, did you reside at David Markley—did you stay at David Markley's residence from November 2nd of 2023 till February 26th of 2024?

A    Yes. I temporarily stayed there.

. . . .

7

Q And, ma'am, that's—you've not resided there [Markley's house], even though you by your admission, you lived there for four months?

A I did not admit I lived there.

Q Well, ma'am, you admitted that you stayed there from November 2nd of 2023 through February 26th of 2024; correct?

A There is a difference in "living" and "staying."

Q So in your mind there is a technical definition problem with the word "living" versus the word "staying," is that correct?

A They are two separate concepts.

. . . .

Q And, ma'am, do you believe that there's a difference between the word "temporarily stayed" and "temporarily resided"?

A Yes.

Q And what's that difference to you?

A I don't know. I don't have a dictionary in front of me.

Rebecca also testified that she stayed at Markley's house overnight during parts of March, April, and May 2024, although she did not know how many nights she spent there. David had hired a private investigation firm to conduct surveillance of Rebecca, and the trial court admitted pictures of Rebecca taken outside of Markley's house, including some pictures taken early in the morning. The court also admitted a surveillance report authored by the investigation firm that included, among other things, a GPS tracking report of Rebecca's vehicle.

Rebecca's counsel introduced numerous exhibits—including bank records, utility bills, Rebecca's driver's license, and her voter registration paperwork—

8

showing the address of the duplex, not Markley's house. Her counsel also introduced pictures of the duplex while it was being renovated and the finished product. Counsel asked her why she believed that she had not cohabitated with Markley, and she testified:

> I have always maintained my own personal lease or, now, mortgage. I've not lived in a permanent place of abode with David Markley on a continuing basis. I have always had my own home. In 2020 when I moved from Houston to Columbus, I got my own apartment. I had a lease. I had bills I had to pay. And then, you know, a year and a half later I was called upon to take care of my aunt. I didn't even move up here [Cleveland] until, I believe, September of '22.
>
> . . . .
>
> I mean, upon moving up here I immediately, it was even prior to moving up here, I had gotten a lease at [the condominium] for a year, and so that would have been August or September '23 through end of August '24. I started looking for an investment property. I felt that that was the responsible thing to do for myself and to also have my own home. And I signed for it and all the documents on the 3rd of November '23, all the while I was paying utilities, insurance, any other expenses necessary to run a household.
>
> I have absolutely no furniture or personal items at David Markley's residence . . . .[2] We are not engaged. We have no plans to marry. We actually had an agreement upon my moving here from Columbus to Cleveland is that we each needed our own space. And, lastly, I'm very aware of the cohabitation clause in the Divorce Decree. I'm dependent on that money and, you know, for my future and I had no intention of violating the rules.

---

[2] On redirect, Rebecca testified that she had "some clothes and makeup" at Markley's house.

9

During closing arguments, the parties disagreed about the meaning of section 8.056(b). David argued that Rebecca's testimony established each element of the statute: (1) cohabitation (2) with someone with whom she was in a dating or romantic relationship (3) in a permanent place of abode (4) on a continuing basis. He argued that Rebecca was attempting to rewrite the statute "by putting 'permanent' in front of 'cohabitation'" when, instead, "permanent" qualified "place of abode," meaning a permanent house. The statute did not require David to prove that Rebecca "had to permanently cohabitate" with Markley. He further argued that if Rebecca "had any intention other than to live on a continuing basis with Mr. Markley in November 2023," she could have unpacked her belongings in her condominium—which was still under lease—until renovations at the duplex were complete. Instead, she resided with Markley, and she presented no corroborating evidence that she actually lived at the duplex even after the renovations were finished.

Rebecca argued that, at most, she was a "frequent overnight guest" at Markley's residence between November 2023 and February 2024. She argued that the statutory requirements had not been met:

> Certainly, the permanent place of abode component in the statute must refer to Ms. Begala, her living in a permanent place of abode. It couldn't be that she's got a permanent place of abode herself and she happens to spend the night or several nights at someone else's residence and because that person owns the residence, that's a permanent place of abode. That totally defeats the concept of cohabitation. We're told by this one case that cohabitation is supposed to be viewed in its common every day usage and understanding. And I think we all know what two

10

people who are living together look like. They're on a lease together typically or they each live in one structure, one place. We understand what living together or cohabitating means. In this case the evidence is replete and clear without contradictory evidence that from the day of divorce until this moment, [Rebecca] has leased or owned her own residence in Ohio through the entirety of this period of time.

Rebecca also pointed out that although she had some clothes and makeup at Markley's house, she did not have her furniture, cookware, or other belongings.[3]

In a written order, the trial court denied David's request to terminate the maintenance obligation. Although David requested findings of fact and conclusions of law, the trial court did not file any findings or conclusions. This appeal followed.[4]

---

[3]　Rebecca testified virtually from the duplex. After closing arguments, the trial court asked Rebecca to take her laptop and show the court the contents of her refrigerator. Rebecca did so and stated, "There is nothing in my fridge." The court disputed this characterization and stated that "[t]here are condiments and certain items in the fridge." At her counsel's direction, Rebecca then showed the court the contents of her closet. The court stated that "the closet reflects items on hangers which would be clothes."

[4]　On appeal, David filed a motion to permit suspension of the trial court's judgment under Texas Rule of Appellate Procedure 24. *See* TEX. R. APP. P. 24.1(a) (providing various ways in which judgment debtor can supersede judgment pending appeal). He argued that "the order to pay $5,000 per month is a judgment under the law," and he was entitled to supersede that judgment during the appellate process. He requested that he be allowed to "deposit the monthly payment of $5,000.00 per month in an interest-bearing account in the office of the Harris County District Clerk." In a February 25, 2025 order, we questioned whether the trial court's order—which effectively continued David's monthly maintenance obligation imposed by the April 2022 divorce decree—was a judgment that could be superseded under Rule 24. We nevertheless carried the motion with the case.

11

**Termination of Spousal Maintenance Obligation**

In two related issues, David argues that the trial court erred by refusing to terminate his obligation to pay maintenance to Rebecca. He argues that under the governing statute, "cohabit" does not require an intent to remain at the permanent abode of another person indefinitely. He further argues that the undisputed evidence demonstrates that Rebecca lived with Markley at his home for nearly four months while they were dating, and her conduct satisfied the elements of the statute requiring termination of David's maintenance obligation.

## A.    Standard of Review

We review a trial court's award of spousal maintenance, as well as a trial court's order continuing or discontinuing maintenance, for an abuse of discretion. *See Dunn v. Dunn*, 177 S.W.3d 393, 395–96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (reviewing post-divorce-decree order that discontinued maintenance obligation originally imposed in divorce decree); *Kelly v. Kelly*, 634 S.W.3d 335, 364 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (reviewing maintenance award imposed in divorce decree). A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision or if reasonable minds could differ as to the result. *Kelly*, 634 S.W.3d at 364. A court abuses its discretion when it rules arbitrarily, unreasonably, without reference to guiding legal principles, or without supporting evidence. *Dunn*, 177 S.W.3d at 396.

12

Under this standard, legal and factual sufficiency of the evidence are not independent grounds for asserting error, but they are relevant factors in assessing whether an abuse of discretion occurred. *Id.* We engage in a two-part inquiry to determine whether the trial court (1) had sufficient information on which to exercise its discretion and (2) erred in its application of that discretion. *Day v. Day*, 452 S.W.3d 430, 433 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). A trial court has no discretion in determining what the law is or applying the law to the facts, even when the law is unsettled. *Bradshaw v. Bradshaw*, 555 S.W.3d 539, 543 (Tex. 2018) (quoting *In re State Farm Lloyds*, 520 S.W.3d 595, 604 (Tex. 2017) (orig. proceeding)).

The meaning of a statute is a legal question that we review de novo. *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g). "Our fundamental goal when reading statutes is to ascertain and give effect to the Legislature's intent." *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017) (quotations omitted). We construe the words and phrases chosen by the Legislature "within the context and framework of the statute as a whole, not in isolation." *In re Tex. Educ. Agency*, 619 S.W.3d 679, 687 (Tex. 2021) (orig. proceeding). "We apply the plain meaning of statutory language unless (1) the Legislature has prescribed definitions, (2) the words have acquired a technical or particular meaning, (3) a contrary intention is apparent from

the context, or (4) a plain-meaning construction leads to nonsensical or absurd results." *Id.* Because we presume that the Legislature chooses each word for a purpose and purposefully omits all other words, we "endeavor to afford meaning to all of a statute's language so none is rendered surplusage." *Id.* at 687–88. We must not rewrite the statute under the guise of interpreting it. *Colorado Cnty. v. Staff*, 510 S.W.3d 435, 444 (Tex. 2017) (quotations omitted).

## B.   Governing Law

Texas has long "rejected post-divorce alimony as contrary to public policy." *Dalton*, 551 S.W.3d at 131. However, if parties to a divorce entered into a voluntary spousal support agreement, Texas courts would often approve those agreements and incorporate them into divorce decrees, although "the obligation remained an agreed duty enforceable as a private contract, rather than a court-ordered duty enforceable as a judgment." *Id.*

In 1995, the Texas Legislature "first authorized courts to award a form of involuntary post-divorce alimony referred to as 'spousal maintenance.'" *Id.*; *see* TEX. FAM. CODE § 8.001(1) (defining "maintenance" as "an award in a suit for dissolution of a marriage of periodic payments from the future income of one spouse for the support of the other spouse"). These awards are permissible "only under very narrow and very limited circumstances." *Dalton*, 551 S.W.3d at 130 (quotations

14

omitted). Family Code section 8.051 sets out when a party is eligible for spousal maintenance:

> In a suit for dissolution of a marriage . . . the court may order maintenance for either spouse only if the spouse seeking maintenance will lack sufficient property, including the spouse's separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs and:
>
> . . . .
>
> > (2)  the spouse seeking maintenance:
> >
> > > (A)  is unable to earn sufficient income to provide for the spouse's minimum reasonable needs because of an incapacitating physical or mental disability;
> > >
> > > (B)  has been married to the other spouse for 10 years or longer and lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs; or
> > >
> > > (C)  is the custodian of a child of the marriage of any age who requires substantial care and personal supervision because of a physical or mental disability that prevents the spouse from earning sufficient income to provide for the spouse's minimum reasonable needs.

TEX. FAM. CODE § 8.051.

In determining the nature, amount, duration, and manner of maintenance payments, courts consider "all relevant factors" including factors such as "each spouse's ability to provide for that spouse's minimum reasonable needs independently, considering that spouse's financial resources on dissolution of the marriage" and "the age, employment history, earning ability, and physical and

15

emotional condition of the spouse seeking maintenance." *Id.* § 8.052(1), (4). Generally, the Family Code limits the duration of maintenance imposed under section 8.051(2)(B) based on the length of the parties' marriage. *Id.* § 8.054(a)(1).

The Family Code also contains a provision that addresses termination of a maintenance obligation. In 1997, the Legislature recodified the statutes relating to the marriage relationship, including the maintenance provisions, and Family Code section 8.007(b) provided that "[a]fter a hearing, the court shall terminate the maintenance order if the party receiving maintenance cohabits with another person in a permanent place of abode on a continuing, conjugal basis." *See* Act of Apr. 3, 1997, 75th Leg., R.S., ch. 7, § 1, sec. 8.007, 1997 Tex. Gen. Laws 8, 36.

After amendments in 2001, in which the Legislature renumbered the statute and substituted the term "obligee" for "party receiving maintenance," the Legislature amended the maintenance termination statute again in 2011, and no further amendments have occurred. *See* Act of May 22, 2001, 77th Leg., R.S., ch. 807, § 1, sec. 8.056, 2001 Tex. Gen. Laws 1574, 1577; Act of May 18, 2011, 82d Leg., R.S. ch. 486, § 5, sec. 8.056, 2011 Tex. Gen. Laws 1238, 1241. Thus, Family Code section 8.056 currently provides:

(a)     The obligation to pay future maintenance terminates on the death of either party or on the remarriage of the obligee.

(b)     After a hearing, the court shall order the termination of the maintenance obligation if the court finds that the obligee cohabits with another person with whom the obligee has a dating or

16

romantic relationship in a permanent place of abode on a continuing basis.

    (c)    Termination of the maintenance obligation does not terminate the obligation to pay any maintenance that accrued before the date of termination, whether as a result of death or remarriage under Subsection (a) or a court order under Subsection (b).

TEX. FAM. CODE § 8.056. The statute does not define "cohabits," "permanent place of abode," or "continuing basis."

Few Texas cases have construed this provision or its statutory predecessor, although some have discussed what "cohabits" or "cohabitation" means in other contexts. For example, informal marriage has a cohabitation element: establishing an informal marriage requires a party to prove that the putative spouses "agreed to be married and after the agreement they lived together in this state as [spouses]." TEX. FAM. CODE § 2.401(a)(2).

In the informal marriage context, "Cohabitation is more than sexual relations under a common roof; it indicates maintaining a household together and doing things ordinarily done by spouses." *In re Marriage of Renteria*, No. 12-23-00171-CV, 2024 WL 3527409, at *4 (Tex. App.—Tyler July 24, 2024, no pet.) (mem. op.) (quotations omitted). "Cohabitation need not be continuous" for a party to establish this element of informal marriage. *Small v. McMaster*, 352 S.W.3d 280, 284 (Tex. App.— Houston [14th Dist.] 2011, pet. denied); *see also Bolash v. Heid*, 733 S.W.2d 698, 699 (Tex. App.—San Antonio 1987, no writ) (op. on reh'g) (concluding that

17

plaintiff's testimony that defendant—who worked in Nigeria—would stay with her every time he returned to San Antonio "is sufficient to support the finding that they lived together as husband and wife to the extent possible under the circumstances").

Texas courts have considered the meaning of "cohabitation" when construing agreements entered into between spouses during divorce proceedings. In *Kurtz v. Jackson*, a decision that pre-dated the enactment of spousal maintenance in this state, this Court addressed whether use of the term "cohabitation" in a marital property and settlement agreement executed incident to a divorce includes remarriage. *See* 859 S.W.2d 609 (Tex. App.—Houston [1st Dist.] 1993, no writ). The parties agreed that the marital residence shall be the separate property of the wife, "subject to a lien of $75,000, without interest, payable to Husband upon sale, transfer or trade of the residence or cohabitation by Wife." *Id.* at 611. After the wife remarried and began living in the house with her new husband, her former husband sued to recover on the lien. *Id.* The trial court found that the wife was not cohabitating and rendered a take-nothing judgment against the former husband. *Id.*

This Court disagreed, stating that "[t]he only reasonable meaning of 'cohabitation' in Schedule A [of the marital property agreement] is that the term includes living with a man, whether married to him or not." *Id.* at 612. In reaching this conclusion, we cited several definitions of "cohabitation," including two definitions from the Oxford English Dictionary—defining cohabitation as

"1. Dwelling or living together; community of life . . . . 2. Living together as husband and wife (often with the implication of not being married)"—and a definition from Black's Law Dictionary—defining cohabitation as "[t]o live together as husband and wife." *See id.* at 612 n.2.

*Allen v. Allen* also concerned an agreement incident to divorce rather than a trial court's award of maintenance. *See* 966 S.W.2d 658 (Tex. App.—San Antonio 1998, pet. denied). In that case, the husband agreed to pay the wife $1,100 per month for twenty years, although his obligation would terminate upon the occurrence of several specified events, including the wife's cohabitation with another man. *Id.* at 659. When the husband stopped making payments after only two years, the wife brought suit to enforce the contractual arrangement. *Id.* The husband argued that his obligation had terminated because his wife cohabitated with another man. *Id.* Trial evidence showed that the wife had two post-divorce relationships:

> [The wife] had a sexual relationship with both of the men, who spent the night with her, although not every night. The first man with whom [the wife] was involved kept his lawnmower, some tools, and a picnic table at [the wife's] house, and brought a change of clothes with him when he stayed overnight. He paid rent on an apartment in another city, and he and [the wife] visited each other. The second man kept a lawnmower at [the wife's] house, did her yard work, loaned her a refrigerator which she kept in a storage room, occasionally bought groceries for meals cooked together, slept at her house almost every weekend, and brought a change of clothing with him when he stayed overnight. He listed his mother's house as his address of record while he was having a house built. Neither of these men shared living expenses or financial resources with [the wife].

19

*Id.* The jury charge included the following definition of "cohabitate": "As used here, the term 'cohabitate' does not require living together, claiming to be married, in the relationship of husband and wife. It can include an irregular, limited, or partial living together for the purpose of having sexual relations." *Id.* at 660. The jury found that the wife had cohabitated with another man. *Id.* at 659.

On appeal, the wife argued that the trial court submitted a definition of "cohabitate" that was not supported by Texas law; instead, it should have submitted the definition from *Kurtz* and Black's Law Dictionary. *Id.* at 660. The San Antonio Court of Appeals concluded that the challenged definition was improper and noted that no definition was required at all because "cohabitation" as used in the parties' agreement "was unambiguous and readily comprehensible by the jury." *Id.* at 661. In determining that submission of the definition was harmful, the court reasoned:

> Rather than inform the jury of what "cohabitation" is, however, the submitted definition tells the jury what the term "does not require" and what it "can include." The one proposed by [the husband] and adopted by the court is not proper because it binds the jury to the court's own creative definition, rather than what the jury would ordinarily understand the parties to mean. The disputed definition is confusing and misleading, potentially causing a jury to characterize as "cohabitation" any number of situations falling outside the ordinary meaning of the word. In particular, we do not believe "cohabitation" would encompass, without more, situations involving a frequent overnight guest or someone who stores personal property at someone else's home.

*Id.*

Other jurisdictions have statutes similar to Texas' maintenance provisions, including statutes governing termination of this support obligation. For example, Illinois law provides that "the obligation to pay future maintenance is terminated upon the death of either party, or the remarriage of the party receiving maintenance, or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." 750 ILL. COMP. STAT. 5/510(c); *In re Marriage of Sunday*, 820 N.E.2d 636, 640 (Ill. App. Ct. 2004) ("The purpose underlying the statutory termination of maintenance when the recipient spouse cohabits with a third party is to remedy the inequity created when the recipient spouse becomes involved in a husband-wife relationship but does not formalize the relationship, so that he or she can continue to receive maintenance from his or her ex-spouse.").

To satisfy the burden of showing that the party receiving maintenance is cohabiting with another, the payor spouse "must make a substantial showing that the former spouse is involved in a *de facto* husband and wife relationship with a third party." *In re Marriage of Walther*, 110 N.E.3d 221, 227 (Ill. App. Ct. 2018) (quotations omitted). Illinois courts consider several "nonexhaustive factors" to determine whether a party is engaged in a *de facto* marriage such that the maintenance obligation should be terminated: (1) the length of the relationship, (2) the amount of time the former spouse and new partner spend together, (3) the nature of the activities in which they participate, (4) the interrelation of their personal

21

affairs, (5) whether they vacation and spend holidays together, (6) the effect the relationship has on the former spouse's financial need for maintenance, and (7) the intended permanence or mutual commitment to the relationship. *In re Marriage of Churchill*, 126 N.E.3d 779, 783 (Ill. App. Ct. 2019). "As opposed to an intimate dating relationship, a *de facto* marriage involves a deeper commitment, permanence and partnership." *Id.* We note that the Illinois statute requires cohabitation on a continuing *conjugal* basis, a requirement that section 8.056 no longer contains.

Like Illinois, West Virginia allows reduction or termination of spousal support "upon specific written findings by the court that since the granting of a divorce and the award of spousal support a de facto marriage has existed between the spousal support payee and another person." W. VA. CODE § 48-5-707(a)(1). The statute lists eleven non-exclusive factors that courts should consider "in determining the relationship of an ex-spouse to another person," including "[t]he period of time that the ex-spouse has resided with another person not related by consanguinity or affinity in a permanent place of abode" and "[t]he duration and circumstances under which the ex-spouse has maintained a continuing conjugal relationship with the other person." *Id.* § 48-5-707(a)(2)(B)–(C). Termination under this statute is discretionary, not mandatory.[5] *Lucas v. Lucas*, 592 S.E.2d 646, 652 (W. Va. 2003).

---

[5]     Some other states grant the trial court discretion to reduce or terminate a spousal support award upon a finding that the party receiving support is cohabitating with another person. *See, e.g.*, CAL. FAM. CODE § 4323(a)(1) (creating rebuttable

When a court makes a finding of de facto marriage, the court must conduct "a factual investigation into the financial circumstances, income, and expenses of the support recipient, including contributions in money or in kind by the cohabitant . . . to determine the recipient's continuing need, if any, for support." *Id.* at 654.

A prior version of Utah's statute provided that an order to pay alimony "shall be terminated upon application of [the payor spouse] establishing that the former spouse is residing with a person of the opposite sex, unless it is further established by the person receiving alimony that the relationship . . . is without any sexual contact." *See Haddow v. Haddow*, 707 P.2d 669, 671–72 (Utah 1985). The Utah Supreme Court held that there were two "key elements to be considered" in determining cohabitation: common residency and "sexual contact evidencing a conjugal association." *Id.* at 672. "[C]ommon residency means the sharing of a common abode that both parties consider their principal domicile for more than a temporary or brief period of time." *Id.*

The Supreme Court of New Hampshire construed an agreed divorce decree that required the husband to pay $25,000 in alimony per year for ten years but also

---

presumption "of decreased need for spousal support if the supported party is cohabiting with a nonmarital partner" and providing that trial court may modify or terminate spousal support upon determination that circumstances have changed); CONN. GEN. STAT. § 46b-86(b) (providing that trial court may suspend, reduce, or terminate alimony payments upon finding that party receiving payments is "living with another person" and "the living arrangements cause such a change of circumstances as to alter the financial needs of that party").

included a provision that the obligation would cease if the wife "cohabitates with an unrelated adult male." *In re Raybeck*, 44 A.3d 551, 552 (N.H. 2012). The court cited several dictionary definitions—including updated definitions from the Oxford English Dictionary and Black's Law Dictionary, which this Court cited in *Kurtz*—and considered definitions of "cohabitation" used in other states. *Id.* at 554–55; *see, e.g.*, *State v. Arroyo*, 435 A.2d 967, 969–70 (Conn. 1980) ("Cohabitation is generally defined as living together as husband and wife. . . . It is the mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations.") (quotations and citations omitted). Ultimately, the court defined cohabitation "as a relationship between persons resembling that of a marriage" and stated that cohabitation "encompasses both an element of continuity or permanency as well as an assumption of marital obligations." *In re Raybeck*, 44 A.3d at 555.

## C. Analysis

### 1. David's Arguments

David argues that the material facts are largely undisputed. Moreover, Rebecca admitted that she and Markley were in a "dating or romantic relationship," and Markley had a "permanent place of abode." Therefore, the question is whether Rebecca "cohabits" with Markley "on a continuing basis." *See* TEX. FAM. CODE § 8.056(b).

He argues that the plain meaning of "cohabits" is "living together." We should not interpret "cohabits" as we do in the informal marriage context, which requires that the parties "lived together in this state as husband and wife." *See id.* § 2.401(a)(2). Section 8.056(b) does not include "husband and wife" language. Furthermore, although a prior version of the statute required cohabitation on a "continuing, *conjugal* basis," the current version does not, suggesting that the cohabitation does not have to resemble a marriage to fall within the statute.

David also contrasts the use of "cohabits" in section 8.056(b) with the terms "residence" and "domicile," which have different meanings and require looking at an individual's intent.[6] According to David, "cohabits," on the other hand, is "an objective and simple determination about whether two people are living together."

---

[6] *See Martinez v. Bynum*, 461 U.S. 321, 330 (1983) ("Although the meaning may vary according to context, 'residence' generally requires both physical presence and an intention to remain."); *Owens Corning v. Carter*, 997 S.W.2d 560, 571 (Tex. 1999) ("With respect to individuals, 'residence' means the '[p]lace where one actually lives or has his home; a person's dwelling place or place of habitation; . . . a dwelling house.'") (quoting BLACK'S LAW DICTIONARY 907 (6th ed. 1991)); *Mills v. Bartlett*, 377 S.W.2d 636, 637 (Tex. 1964) (stating that "residence" is "extremely difficult to define," meaning of term "depends upon the circumstances surrounding the person involved and largely depends upon the present intention of the individual," and we should consider "[v]olition, intention and action" in "determining where a person resides"); *Snyder v. Pitts*, 241 S.W.2d 136, 139 (Tex. 1951) (stating elements of "domicile" as "[a]n actual residence" and "[t]he intent to make it the permanent home," defining "home" as "a true fixed and permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning," and stating that "there can be but one domicile and several residences") (quotations omitted).

David further argues that construing "cohabits" as "living together" is consistent with Texas' long-standing distaste for permanent alimony and the purpose of allowing maintenance in "very limited" circumstances to assist the ex-spouse in attaining financial independence. He argues that once the ex-spouse has started living with a new romantic partner, that spouse is financially independent, and the payor spouse should not be required to continue supporting the ex-spouse and the new partner.

Applying the law to the facts, David argues that Rebecca's testimony establishes all elements of section 8.056(b). He disagrees that he was required to prove that Rebecca stayed at Markley's house on a permanent—rather than temporary—basis, or that he was required to prove that Rebecca did not intend to return to either her condo or her duplex. He further argues that Rebecca stayed at Markley's house every day for 116 days—almost four months—and that satisfies the statutory requirement that the cohabitation be on a "continuing basis."

### 2. Rebecca's Arguments

Rebecca primarily argues that when considering dictionary definitions of "cohabitation" and reading section 8.056(b) as a whole—not merely construing "cohabits" in isolation but accounting for the remainder of the phrase, which requires the cohabitation to occur "in a permanent place of abode on a continuing basis"— the statute implies a long-term or permanent arrangement, not a temporary one. She

also argues that "permanent place of abode" means an abode that is permanent to both the ex-spouse and the ex-spouse's new partner, "the place that each person considers to be where they live permanently." She further cites dictionary definitions that define "continuing" as "going on and on without any interruptions," and she argues that section 8.056(b) "requires termination of spousal support only when there has been cohabitation that has been going on and on without any interruption." She also argues that the 2011 amendment to section 8.056(b)—which removed "conjugal"—makes it clear that a relationship that does not rise to the level of a ceremonial or informal marriage may qualify under section 8.056(b) if it is "truly a committed living arrangement with indicia of permanency."

Rebecca argues that her conduct does not meet the requirements for termination of the maintenance obligation. She "temporarily stayed" with Markley for almost four months, but she had two other abodes: her condo, which was packed in anticipation of her moving; and her duplex, which was undergoing significant renovations. She points out that 116 days is less than one-third of a calendar year, and this should not qualify as "continuous."

### 3. Holding

Although the statute has several components, some components are readily established by the record evidence presented here. First, the evidence conclusively shows Rebecca cohabitated with Markley in a dating or romantic relationship.

Second, it conclusively shows that Markley's house is a permanent place of abode. Although the parties disagree about what makes a place of abode "permanent," we believe that a house qualifies as such a place. By requiring a permanent place of abode, the Legislature distinguished a house from a transitory dwelling place such as a hotel room or a cabin on a cruise ship. In fact, a house would seem to be the quintessential example of a permanent place of abode.

By far the hardest question here is whether the conduct took place on a continuing basis. The statute does not define "continuing." Ideally, the statute might have specified a time span during which matters must remain "continuing," such as a week, a month, a year, or a decade. But it does not do so. We will therefore examine the statutory scheme more holistically. *See Cadena Comercial USA*, 518 S.W.3d at 326 ("[W]e consider the context and framework of the entire statute and meld its words into a cohesive reflection of legislative intent.").

Spousal maintenance obligations come with strict limits and preconditions. As noted earlier, the termination provision once spoke of ending the obligation upon a showing of cohabitation that took place on a "continuing, conjugal basis," but the Legislature later removed the word "conjugal" and left the phrase "on a continuing basis" without specifying any particular period of time. Even so, Chapter 8 offers some guidance about this temporal component. First, a decade is too long a period, because Chapter 8 says that maintenance imposed under section 8.051(2)(B)—as

occurred in this case—can never last for more than 10 years. *See* TEX. FAM. CODE § 8.054(1)(C). Second, the statute defines maintenance as "periodic payments." *Id.* § 8.001(1); *see also id.* § 8.052 (stating that if spouse is eligible for maintenance, court must determine "the nature, amount, duration, and manner of periodic payments"). How long is that period? The text strongly indicates that the period envisioned by the Legislature is one month:

- It creates an absolute payment cap at $5,000 per month. *Id.* § 8.055(a)(1).

- It creates a second cap at 20% of average "monthly" gross income. *Id.* § 8.055(a)(2).

- It speaks of "monthly maintenance." *Id.* § 8.252 (relating to requirements for writ of withholding).

A one-month period thus appears to be the temporal coin of the realm.

Accordingly, if statutory cohabitation takes place for two months, it has continued from one monthly maintenance period to a second such period. That quantity of cohabitation satisfies the statutory requirement for a "continuing basis." Given the evidence of staying overnight for 116 days, and given the sworn admission of doing so "for 60 days or more continuously," we hold that the conditions for statutory termination of maintenance have occurred. We therefore reverse the trial court's decision and order maintenance terminated.

One could easily imagine policy arguments for demanding a set number of days or months as a precondition to terminating monthly maintenance payments. For

example, the statute could have required 180 days of cohabitation. But the Legislature wrote the statute in a different way. It required only that the cohabitation occur "on a continuing basis." That language must be given meaning. The courts have no warrant for rewriting the statute to suit their own policy preferences.

This holding does not conclude the case, however, because we have carried a Rule 24 motion relating to security pending appeal. Rule 24 permits us to issue temporary orders to preserve the parties' rights. *See* TEX. R. APP. P. 24.4(c). This case presents an apt occasion for exercising that authority.

In his Rule 24 motion, David asked to make payments into the registry of the trial court for the duration of the appeal, as a way of (1) superseding the payment obligation and (2) preventing the need to pursue recoupment later in the event of a decision that the payments should stop. We declined to grant any Rule 24 relief on an emergency basis. Instead, we carried the Rule 24 motion and fast-tracked the appeal by accelerating the filing deadlines for the briefing and by setting the case for oral argument on an expedited basis, so that both sides could be fully heard on this significant issue of first impression.

So that discretionary review may be sought, we believe that the appropriate course for preserving the parties' rights is to have all future payments made into the registry of the trial court in an interest-bearing account until issuance of the mandate. It is therefore so ordered. *See id.*

**Conclusion**

We reverse the decision of the trial court and render judgment terminating David's spousal maintenance payments.


David Gunn
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.